UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,
                                    Plaintiff,

                    v.

JOSEPH MELI,                                           Civil Action No. 17-cv-632-LLS
MATTHEW HARRITON,
875 HOLDINGS, LLC,
127 HOLDINGS, LLC,                                     JURY TRIAL DEMANDED
ADVANCE ENTERTAINMENT, LLC, and
ADVANCE ENTERTAINMENT II, LLC,

                    Defendants, and

JESSICA INGBER MELI,
127 PARTNERS, LLC,
127 ICONIC HOLDINGS, LLC,
ANNA MELI,
NINETEEN TWO PRODUCTIONS, LLC,
MXCU HOLDINGS, LLC, and
MASH TRANSACTIONS, LLC,

                    Relief Defendants.

## FIRST AMENDED COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission" or "SEC"), alleges as

follows:

## SUMMARY

1.       This case involves an ongoing fraudulent scheme in which defendants Joseph

Meli ("Meli"), Matthew Harriton ("Harriton"), 875 Holdings, LLC ("875 Holdings"), 127

Holdings, LLC ("127 Holdings"), Advance Entertainment, LLC ("Advance Entertainment"), and

Advance Entertainment II, LLC ("Advance Entertainment II") (collectively, the "Defendants")

raised, and are continuing to raise, more than $97 million from 2015 to the present from at least 138 investors located in 17 states, for purported investment in ticket reselling enterprises involving high profile events including, among others: the Broadway musical *Hamilton*; Adele, Metallica, and Nine Inch Nails concerts; a concert festival known as Desert Trip, featuring artists including The Rolling Stones, Bob Dylan, Paul McCartney, and others; and advance sales for the upcoming Broadway play *Harry Potter and the Cursed Child*, currently playing in London. From 2015 to the present, Defendants diverted at least $74 million of the more than $97 million raised from investors to perpetuate a Ponzi scheme and to enrich themselves and certain family members and others.

2.      From at least 2015 to the present, Meli and Harriton have represented to investors and prospective investors that they would pool investor funds to purchase large blocks of tickets for major concerts and theatrical performances.  Meli and Harriton further represented that the tickets then would be resold at a profit to produce high returns for the investors.  Investors received written contracts with 875 Holdings, 127 Holdings, Advance Entertainment, and Advance Entertainment II (collectively, the "Four Entities") which typically promised that proceeds from ticket resales would be distributed first toward full repayment of principal plus a 10% annualized profit, to be paid in less than one year from investment.  In addition, investors were typically promised 50% of any profits from the ticket resales that remained after investors received their return of principal and 10% annualized profit.

3.      Meli and Harriton represented to investors that all or substantially all of their investment would be used to purchase tickets in bulk for resale.  Contrary to the representations by Meli and Harriton, only a small fraction (less than 14%) of investor funds raised was used to make payments to entities with any apparent connection to ticket sales or live event production.

Instead, from 2015 to the present, more than $59 million of incoming funds from investors were used to repay and provide purported investment returns to other investors, thereby perpetuating the illusion of a profitable, ongoing investment.  This enabled Meli and Harriton to raise even more money from investors and to fraudulently use investor money for personal benefit.

4.      From 2015 to the present, investor funds totaling approximately $1.3 million were transferred from one or more of the Four Entities to Harriton.  During this same timeframe, investor funds totaling approximately $1.5 million were withdrawn from bank accounts in the name of 127 Holdings and Advance Entertainment, which accounts are controlled by Meli.  Investor funds also have been used from 127 Holdings and Advance Entertainment to make payments for what appear to be personal expenses, including, from 2015 to the present: at least $5 million in payments for jewelry and other retail purchases, private school and camp tuition, automobiles, private club memberships and expenses, wine, restaurants, driving services (including limousines), travel expenses and hotels, and payments to casinos; and at least an additional $1.8 million in payments made to architecture, design, or construction firms.  Investor funds also have been transferred between and among the Four Entities, all of which are entities Meli or Harriton control.  These payments were not disclosed to investors and were used for purposes inconsistent with representations made to investors by the Defendants.

5.      From 2015 to the present, investor funds also have been transferred from one or more of the Four Entities to: Jessica Ingber Meli (Joseph Meli's spouse) and personal credit card accounts in the name of Jessica Ingber Meli, totaling more than $710,000; Anna Meli (Joseph Meli's mother), totaling at least $405,000; 127 Partners, LLC ("127 Partners"), an entity controlled by Meli, totaling at least $307,000; 127 Iconic Holdings, LLC ("127 Iconic Holdings"), an entity controlled by Meli, totaling at least $489,000; Nineteen Two Productions,

3

LLC ("Nineteen Two Productions"), an entity controlled by Meli, totaling at least $260,000; MXCU Holdings, LLC ("MXCU Holdings"), an entity controlled by Harriton, totaling at least $325,000; and Mash Transactions, LLC ("Mash Transactions"), an entity controlled by Harriton, totaling more than $70,000 (collectively, the "Relief Defendants").  In addition, in or around October 2015, a property was purchased in East Hampton, New York for approximately $3 million in cash in the name of Jessica Ingber Meli.  The purchase was funded by investor funds transferred from a bank account in the name of Advance Entertainment, which account is controlled by Joseph Meli.  The Relief Defendants have no legitimate interest in, or right to, the funds they received, which represent proceeds of the fraudulent scheme.

6.      As a result of the conduct alleged herein, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 340.10b-5].

7.      The Commission seeks emergency preliminary relief, including a temporary restraining order against further violations of the federal securities laws and an emergency asset freeze to preserve assets necessary to satisfy any eventual judgment against the Defendants.  The Commission also requests an immediate accounting, expedited discovery, a repatriation order, an order prohibiting the Defendants from continuing to accept or deposit additional investor funds, and an order prohibiting the alteration or destruction of relevant documents.

8.      The Commission also seeks a permanent injunction against the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, civil penalties pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C.

§ 78u(d)(3)], and such other relief as the Court may deem appropriate.

9.      The Commission also seeks an order requiring all Relief Defendants to disgorge,

with prejudgment interest, all ill-gotten gains obtained from any of the Defendants.

10.     The Commission further seeks appointment of a receiver over Defendants and

Relief Defendants pursuant to Federal Rule of Civil Procedure 66.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15

U.S.C. §§ 78u(d), 78u(e), and 78aa].

12.     Venue lies in this district pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts,

practices, transactions and courses of business alleged in this Complaint, including

communications with investors and prospective investors, occurred within the Southern District

of New York, and were effected, directly or indirectly, by making use of means or

instrumentalities of transportation or communication in interstate commerce, or the mails.  In

addition, Meli and Harriton reside in the district.

## DEFENDANTS

13.     Joseph Meli, age 42, lives in New York, New York.  He and Harriton are the

direct or indirect owners of Advance Entertainment II.  Meli owns 100% of Advance

Entertainment which, in turn, owns an 80% interest in Advance Entertainment II.  Meli also

controls 127 Holdings, 127 Partners, 127 Iconic Holdings, and Nineteen Two Productions.  Meli,

with Harriton, manages 875 Holdings, which Harriton controls.

5

14.     Matthew Harriton, age 52, lives in New York, New York.  He and Meli are the direct or indirect owners of Advance Entertainment II, and Harriton, with Meli, manages 875 Holdings.  Harriton owns an 80% interest (through two intermediary LLCs) in 875 Holdings. Harriton directly owns a 20% interest in Advance Entertainment II.  Harriton also controls Mash Transactions and MXCU Holdings.

15.     875 Holdings, LLC is a Delaware limited liability company organized in 2015 with a principal place of business in Stamford, Connecticut.  Meli and Harriton together manage 875 Holdings, which Harriton controls.  Meli and Harriton are the named signers for an 875 Holdings bank account that received investor funds and was used to make payments as part of the ticket investment scheme.

16.     127 Holdings, LLC is a Delaware limited liability company controlled by Meli and organized in 2009 with a principal place of business at what appears to be Meli's residence in New York, New York.  Meli is the sole named account signer for a 127 Holdings bank account that received investor funds and was used to make payments as part of the ticket investment scheme.

17.     Advance Entertainment, LLC is a Delaware limited liability company controlled by Meli and organized in 2011 with a principal place of business in New York, New York at what appears to be Meli's residence.  Meli is a named signer for one or more Advance Entertainment bank accounts that received investor funds and were used to make payments as part of the ticket investment scheme.

18.     Advance Entertainment II, LLC is a Delaware limited liability company organized in 2016 with a principal place of business in New Canaan, Connecticut.  Harriton manages Advance Entertainment II, and Meli and Harriton directly or indirectly own Advance

Entertainment II.  Harriton is the sole named signer for Advance Entertainment II bank accounts that received investor funds and were used to make payments as part of the ticket investment scheme.

## RELIEF DEFENDANTS

19.     Jessica Ingber Meli is the spouse of and lives at the same address as Joseph Meli in New York, New York.  From January 2015 to January 2017, she and personal credit card accounts in her name received more than $710,000 of investor funds from the ticket investment scheme through transfers and payments from 127 Holdings.  Additionally, in or around October 2015, a property was purchased in East Hampton, New York for approximately $3 million in cash in the name of Jessica Ingber Meli.  The purchase of the property was funded by investor funds from the ticket investment scheme transferred from a bank account in the name of Advance Entertainment.

20.     Anna Meli is the mother of Joseph Meli and maintains an address in the same building as Joseph Meli in New York, New York.  From January 2015 to January 2017, she received at least $405,000 of investor funds from the ticket investment scheme through transfers and payments from Advance Entertainment and 127 Holdings.

21.     127 Partners, LLC is a Delaware limited liability company controlled by Meli and organized in 2009 with a principal place of business at what appears to be Meli's residence in New York, New York.  From January 2015 to January 2017, a 127 Partners bank account received at least $307,000 of investor funds from the ticket investment scheme through transfers and payments from 127 Holdings.

22.     127 Iconic Holdings, LLC is a Delaware limited liability company controlled by Meli and organized in 2013 with a principal place of business at what appears to be Meli's

residence in New York, New York.  From January 2015 to January 2017, a 127 Iconic Holdings bank account received at least $489,000 of investor funds from the ticket investment scheme through transfers and payments from 127 Holdings.

23.     Nineteen Two Productions, LLC is a New York limited liability company organized in 2015 with a principal place of business at what appears to be Joseph Meli's residence in New York, New York.  Joseph Meli and another individual were the named signers for a bank account in the name of Nineteen Two Productions that is now closed.  From January 2015 to January 2017, this Nineteen Two Productions bank account received at least $260,000 of investor funds from the ticket investment scheme through transfers and payments from Advance Entertainment and 127 Holdings.

24.     MXCU Holdings, LLC is a Delaware limited liability company managed and controlled by Harriton and organized in 2013 with a principal place of business in New York, New York.  Harriton is the sole named signer for a bank account in the name of MXCU Holdings, and Harriton is identified as MXCU Holdings' manager in the account opening documents.  From January 2015 to January 2017, this MXCU Holdings bank account received at least $325,000 of investor funds from the ticket investment scheme through transfers and payments from Advance Entertainment.

25.     Mash Transactions, LLC is a Delaware limited liability company controlled by Harriton and organized in 2011 with a principal place of business in New York, New York.  Mash Transactions indirectly owns 875 Holdings (through another intermediate entity).  Harriton is the sole authorized signer on a bank account in the name of Mash Transactions, and Harriton is identified as an officer, member, and 100% beneficial owner in the account opening documents.  From January 2015 to January 2017, this Mash Transactions bank

8

account received more than $70,000 of investor funds from the ticket investment scheme through transfers and payments from 127 Holdings and 875 Holdings.

## FACTS

26.     From January 2015 to January 2017, Meli and Harriton offered and sold a total of more than $97 million of interests in the Four Entities (Advance Entertainment, Advance Entertainment II, 875 Holdings and 127 Holdings), all of which purportedly engaged in bulk ticket purchases and resales.  Investors frequently invested in more than one entity at various times and may not have clearly distinguished among the entities, which made similar representations about their businesses.

### 875 Holdings

27.     875 Holdings was organized in or around July 2015.  The next month, 875 Holdings filed a Form D with the SEC stating that the company was making a private offering of equities in an unspecified business with no revenue, and had sold $1,050,000 to date.  In February 2016, 875 Holdings filed an amended Form D stating that 25 persons had invested in the offering, with a total amount sold of $3.4 million.

28.     From in or around July 2015 through January 2017, 875 Holdings received a total of at least $7.1 million from investors.  In soliciting the investments, Meli and Harriton represented that investor money would be pooled and used to buy a participation interest in profits from the resale of tickets for high profile events.  Investors were further told that 875 Holdings was a diversified fund whose purpose was to purchase tickets to various shows, and that the fund would have discretion as to which shows or events to purchase tickets for.  Funds raised from investors into 875 Holdings were spent or transferred contrary to representations

made to investors, including for the purpose of repaying other investors and making transfers to Harriton and Mash Transactions, an entity controlled by Harriton.

Advance Entertainment

29.     From January 2015 to January 2017, Advance Entertainment, which was formed in 2011, received more than $64 million from investors.  Funds raised from investors into Advance Entertainment were spent or transferred contrary to representations made to investors, including for the purpose of repaying other investors, withdrawals, paying for personal and legal expenses, funding the purchase of a property in the Hamptons in the name of Jessica Ingber Meli, and making transfers to Harriton and several Relief Defendants.

30.     In December 2015, Meli signed a "Funding Agreement" on behalf of Advance Entertainment with an investor.  In the Funding Agreement, Advance Entertainment falsely represented that it had a signed agreement with the producer of the Broadway musical *Hamilton* to purchase 35,000 tickets to the musical and that the investor's money would be used to pay part of the cost of obtaining the tickets.  The Funding Agreement provided that within eight months, the investor would receive, from the proceeds of the resale of *Hamilton* tickets, the return of its principal, along with "an amount sufficient to generate a 10% annualized return" on the investment, and that the investor would also receive 50% of any further proceeds less Advance Entertainment's reasonable expenses incurred in reselling the tickets.  Similar representations were made to other investors and potential investors.  Some investors were provided with a signed "Letter Agreement" between Advance Entertainment (signed by Meli) and the producer of *Hamilton* purporting to show that Advance Entertainment had an agreement to purchase 35,000 tickets to *Hamilton* on Broadway for a total of $7 million.  On some occasions, Harriton provided this signed "Letter Agreement" with the producer of *Hamilton* to investors or

10

prospective investors.  Meli and Harriton sometimes referred to the "Letter Agreement" with the *Hamilton* producer as a "vault agreement."  The representations in the Funding Agreement were false, and the "Letter Agreement" with the *Hamilton* producer was fraudulent.  Neither Advance Entertainment nor any of Meli or Harriton's other entities had any legitimate agreement with the *Hamilton* producer to purchase tickets to the musical, and no purchase of 35,000 tickets to the musical was made with investor money.

31.     In January 2017, Meli signed another "Funding Agreement" on behalf of Advance Entertainment with an investor.  In the Funding Agreement, Advance Entertainment falsely represented that it had entered into an agreement with the theater company associated with *Harry Potter and the Cursed Child* to purchase 250,000 tickets for a total of $62.5 million to an upcoming Broadway run of the play, and that the investor's money would be used to pay part of the cost of obtaining the tickets.  The Funding Agreement provided that the investor would receive, from the proceeds of the resale of tickets to *Harry Potter and the Cursed Child*, the return of its principal, followed by a pro rata share of certain profits.  Meli provided the investor with a signed "Letter Agreement" (which he referred to as a "vault agreement") between Advance Entertainment and the theater company purporting to show that Advance Entertainment had an agreement to purchase 250,000 tickets to *Harry Potter and the Cursed Child* on Broadway for a total of $62.5 million.  The representations in the Funding Agreement were false, and the "Letter Agreement" with the theater company was fraudulent.  Neither Advance Entertainment nor any of Meli or Harriton's other entities had any agreement with the theater company to purchase tickets to the *Harry Potter* play on Broadway, and no purchase of 250,000 tickets to the play was made with investor money.

32.     In or around January 2017, Meli solicited and obtained an investment with Advance Entertainment to be used for the purchase of block tickets to Metallica concerts.  Meli and Advance Entertainment falsely represented that the investment would be used to purchase tickets to an upcoming Metallica concert tour, and that the investor would receive certain profits from the resale of the Metallica tickets.  In fact, the investment was used in a manner not consistent with these representations, including to repay earlier investors and to transfer money for legal expenses.

33.     In or around January 2017, Meli solicited and obtained an investment with Advance Entertainment to be used for the purchase of block tickets to Nine Inch Nails concerts. Meli and Advance Entertainment falsely represented that the investment would be used to purchase tickets to Nine Inch Nails concerts, and that the investor would receive certain profits from the resale of the Nine Inch Nails tickets.  In fact, the investment was used in a manner not consistent with these representations, including to repay an earlier investor and to transfer money for legal expenses.

<u>Advance Entertainment II</u>

34.     Advance Entertainment II was organized in or around February 2016. The next month, Advance Entertainment II filed a Form D with the SEC stating that the company was making a private offering of equities in an unspecified business with no revenue, and had made sales totaling $10,220,000 to date.  Advance Entertainment II filed a second Form D in August 2016 for another offering of $13,000,000.

35.     From February 2016 to January 2017, Advance Entertainment II received at least $17.5 million of investor funds.  In soliciting investments for Advance Entertainment II, Meli and Harriton each represented to investors that money invested with the company would be

pooled to buy a participation interest in profits from the resale of tickets to high profile events, including the Broadway musical *Hamilton* (which Meli and Harriton sometimes referred to as "Event I"), Adele concerts (which Meli and Harriton sometimes referred to as "Event II"), and a concert festival known as Desert Trip (which Meli and Harriton sometimes referred to as "Event III"). Investors typically received a "Profit Participation Purchase Agreement" which confirmed that they were "acquiring a participation interest in a portion of the proceeds derived by the Company from the re-sale of tickets it intends to acquire for a specific Event." The agreement typically included a "participation schedule" stating that within nine months from the investment, the investor would receive a 10% "preference percentage," or return on investment, and a "remainder percentage" of 50%, meaning 50% of any additional profits from the ticket resales. Funds raised from investors into Advance Entertainment II were spent or transferred contrary to representations made to investors, including for the purpose of repaying other investors and making transfers to Harriton.

### 127 Holdings

36.     127 Holdings was organized in or around 2009. From January 2015 to January 2017, 127 Holdings received more than $8 million of investor funds. Funds raised from investors into 127 Holdings were spent or transferred contrary to representations made to investors, including for the purpose of repaying other investors, withdrawals, paying for personal and legal expenses, and making transfers to several Relief Defendants.

37.     According to an individual who invested $500,000 in 127 Holdings in or around June 2015, and who later invested additional funds in Advance Entertainment, Meli made substantially the same representations to the investor concerning 127 Holdings as he made concerning Advance Entertainment. In particular, Meli represented that an agreement was in

13

place with the producer of *Hamilton* to purchase tickets to the musical in bulk, that the investor's money would be used to pay part of the cost of obtaining these tickets from the *Hamilton* producer, and that the investor would receive a return on his investment from the resale of tickets obtained from the *Hamilton* producer.  Those representations were false.  None of Meli or Harriton's entities had any legitimate agreement with the *Hamilton* producer to purchase tickets to the musical in bulk, and no bulk purchase of tickets from the *Hamilton* producer was made with investor money.

Defendants Use Investor Funds to Pay Obligations to Prior Investors

38.     From January 2015 to January 2017, Meli and Harriton caused the Four Entities to receive funds totaling more than $97 million from investors.  During that same period, Meli and Harriton caused the Four Entities to spend less than 14% of that amount (approximately $13.4 million) to make payments to third parties that appear to have any connection with ticket sales or live event production.

39.     The largest category of payments the Four Entities made was to individuals and entities that appear to have made earlier investments in the Four Entities, providing purported returns on their investments.  From January 2015 to January 2017, the Four Entities received less than $6.5 million from third parties with any apparent connection to the ticket sales or live event industries, yet they paid out over $59 million to investors.  A significant portion of these payments to earlier investors came directly from the funds of later investors.

40.     Defendants did not pool the more than $97 million received from investors to buy bulk tickets to high profile events for resale at a profit to be distributed to investors.  Instead, Defendants operated a Ponzi scheme, making payments to prior investors from new investor funds.  Defendants did not tell investors that, contrary to their representations and contrary to the

14

terms of the written agreements with investors signed by Meli and Harriton, a significant portion of the invested funds would be used for purposes other than purchasing tickets for resale.

*Investor A*

41.     Between January and August 2016, Investor A invested a total $1.85 million with Meli and Harriton; specifically, he made separate investments in 875 Holdings, Advance Entertainment and Advance Entertainment II.  Investor A first met Meli and Harriton in December 2015 or January 2016.  Investor A met both Meli and Harriton in person, and he also spoke with each of them on the phone.  Investor A learned from Meli and Harriton that they were in the business of purchasing tickets in bulk and reselling them on the secondary market.  Meli and Harriton represented to Investor A that his money would be pooled with other investors' funds and used solely for the purchases of tickets associated with events or shows.

42.     Between January and August 2016, Investor A invested $1.85 million with Meli and Harriton in four tranches.  First, on or about January 11, 2016, Investor A invested $500,000 into 875 Holdings.  Meli and Harriton told Investor A that 875 Holdings was a diversified fund whose purpose was to purchase tickets for various shows, and that 875 Holdings would have discretion as to which shows or events to purchase tickets for.  Next, in January and February 2016, Investor A invested a total of $350,000 (consisting of $250,000 on or about January 22, 2016, and $100,000 on or about February 12, 2016) into Advance Entertainment to be used for an investment into a ticket purchase for the Broadway musical *Hamilton*.  Third, on or about March 3, 2016, Investor A invested $700,000 into Advance Entertainment II.  His understanding based on communications with Meli and Harriton was that $200,000 of that investment would be used to fund further purchases of *Hamilton* tickets, and that $500,000 of that investment would be used to fund tickets to Adele concerts.  Finally, on or about August 23, 2016, Investor A

invested an additional $300,000 into Advance Entertainment II to be used to fund the bulk purchase and resale tickets to Desert Trip, a concert festival featuring The Rolling Stones, Bob Dylan, Paul McCartney and other high profile musicians.

43.     At or around the times of each of his investments, Investor A signed investment contracts with the entities into which he was investing his funds.

44.     Investor A's funds were deposited into several different bank accounts controlled by one or more of the Defendants and then spent or transferred contrary to the representations made to him by Meli and Harriton, and not consistent with the purported investment into event ticket purchases and resales.  Payments and transfers included, by way of example:

    a.  Investor A's initial investment of $500,000 into 875 Holdings was used, in whole or in part, to fund a payment to another investor, rather than for ticket purchases and resales.  On or about January 11, 2016, the $500,000 investment was deposited into an 875 Holdings account at Signature Bank ending in '1199.  On or about January 12, 2016, all, or at least a significant portion of this investment, along with other available account funds totaling $650,000, was transferred to an Advance Entertainment account at Merrill Lynch ending in '3098.  On or about January 14, 2016, Advance Entertainment used $1.2 million from the Merrill Lynch '3098 account to pay another investor.  This payment was funded in part by the transfer from 875 Holdings, including Investor A's funds.

    b.  On or about January 22, 2016, Investor A's $250,000 investment into Advance Entertainment was deposited into an Advance Entertainment account at Merrill Lynch ending in '3098.  On or about January 26, 2016, all, or at least a significant portion of this investment, along with other available account funds totaling

16

$600,000, was used to pay another investor out of the Advance Entertainment account.

    c.    On or about March 3, 2016, Investor A's $700,000 investment was deposited into an Advance Entertainment II account at Signature Bank ending in '2528.  On the same day, $500,000 was transferred from the Advance Entertainment II account to Advance Entertainment, and another $200,000 was transferred from the Advance Entertainment II account to Harriton's father.

### *Investor B*

45.    On or about December 16, 2015, Investor B signed a Funding Agreement to invest $1.25 million into Advance Entertainment to fund a portion of a pooled investment to purchase and resell 35,000 tickets to the *Hamilton* musical.  The Funding Agreement referenced an underlying letter agreement dated in October 2015 between Advance Entertainment and the *Hamilton* producer for the purchase of 35,000 tickets.  In reality, neither Advance Entertainment nor any of Meli or Harriton's other entities had any legitimate agreement with the *Hamilton* producer to purchase tickets to the musical, and no purchase of 35,000 tickets to the musical was made with investor money.  Advance Entertainment received Investor B's $1.25 million on or about December 28, 2015, deposited in Advance Entertainment's Merrill Lynch account ending in '3098.  After the deposit of this $1.25 million of investor funds, the daily balance of the Advance Entertainment account was approximately $1.94 million.  The following day, Advance Entertainment disbursed $1.5 million from this account to a third party who has no involvement in ticket sales or live event production, for *Hamilton* or any other event.

### *Investor C*

46.    Between approximately June and October 2015, another individual and his

affiliated business (collectively, "Investor C") invested $6 million into Advance Entertainment and 127 Holdings.  Similar to Investor B, all or a significant portion of Investor C's funds were invested for the bulk purchase of *Hamilton* tickets based on false representations from Meli, who claimed that an agreement was in place with the producer of *Hamilton* to purchase $7 million worth of tickets for resale.  Investor C's funds were deposited into company bank accounts controlled by Meli and then spent or transferred contrary to representations made to Investor C, including to fund the purchase of a property in East Hampton, New York in the name of Jessica Ingber Meli.

### *Investor D*

47.     On or about January 12, 2017, Investor D invested $2 million into Advance Entertainment for the purchase of block tickets to Metallica concerts.  Meli and Advance Entertainment falsely represented that the investment would be used to purchase tickets to an upcoming Metallica concert tour, and that Investor D would receive certain profits from the resale of the Metallica tickets.  In fact, the investment was used in a manner not consistent with these representations.  By January 26, 2017, all or the vast majority of Investor D's $2 million investment had been used for purposes inconsistent with Meli and Advance Entertainment's representations, including to repay earlier investors and to pay for legal expenses.

### *Investor E*

48.     In January 2017, Investor E invested a total of $7.86 million into Advance Entertainment (paid through five payments to an Advance Entertainment account at Merrill Lynch ending in '3098 from on or about January 18, 2017 to on or about January 24, 2017).  Investor E entered into a Funding Agreement with Advance Entertainment, signed by Meli, which falsely represented that Advance Entertainment had entered into an agreement with the

theater company associated with *Harry Potter and the Cursed Child* to purchase 250,000 tickets for a total of $62.5 million to an upcoming Broadway run of the play, and that the investor's money would be used to pay part of the cost of obtaining the tickets, with the principal and certain profits from the ticket sales to be returned to the investor.  Meli provided Investor E with a "Letter Agreement" (which he referred to as a "vault agreement") between Advance Entertainment and the theater company purporting to show that Advance Entertainment had secured an agreement to purchase 250,000 tickets.  The representations in the Funding Agreement were false, and the "Letter Agreement" that Meli provided to the investor was fraudulent.  Advance Entertainment did not have any agreement with the theater company to purchase tickets to the *Harry Potter* play, and no purchase of 250,000 tickets was made with investor money.  Instead, by January 26, 2017, just two days after Investor E's last payment was sent to Advance Entertainment, all or the vast majority of Investor E's $7.86 million investment had been used for purposes inconsistent with Meli and Advance Entertainment's representations, including to repay earlier investors and to pay for legal expenses.

### Investor F

49.     On or about January 25, 2017, Investor F invested $500,000 into Advance Entertainment for the purchase of block tickets to Nine Inch Nails concerts.  Meli and Advance Entertainment falsely represented that the investment would be used to purchase tickets to Nine Inch Nails concerts, and that Investor F would receive certain profits from the resale of the Nine Inch Nails tickets.  In fact, the investment was used in a manner not consistent with these representations.  On or about January 26, 2017, one day after Investor F's investment, all or the vast majority of the $500,000 investment was used for purposes inconsistent with Meli and Advance Entertainment's representations, including to repay Investor B and for legal expenses.

50.     On or about January 26, 2017, Investor B received a wire transfer of $1,250,000 as a purported return of principal and/or a return on an earlier investment.  The funds for this transfer appear to have come from deposits during January 2017 by other investors, including Investors D, E, and F.

Defendants Use Investor Funds for Other Undisclosed Purposes

51.     In addition to using new investor funds to make payments owed to existing investors, from January 2015 to January 2017, at least $5 million of investor funds was used from 127 Holdings and Advance Entertainment to pay for jewelry and other retail purchases, private school and camp tuition, automobiles, private club memberships and expenses, wine, restaurants, driving services (including limousines), travel expenses and hotels, and payments to casinos; and at least an additional $1.8 million in payments were made to architecture, design, or construction firms.  These payments were not disclosed to investors and were used for purposes inconsistent with representations made to investors by the Defendants.

52.     From January 2015 to January 2017, investor funds totaling approximately $1.3 million were transferred from one or more of the Four Entities to Harriton.  These payments were not disclosed to investors and were used for purposes inconsistent with representations made to investors by the Defendants.

53.     From January 2015 to January 2017, an additional approximately $1.5 million of investor funds were withdrawn from bank accounts in the name of 127 Holdings and Advance Entertainment, which accounts are controlled by Meli.  These withdrawals were not disclosed to investors and were used for purposes inconsistent with representations made to investors by the Defendants.

54.     On or about January 26, 2017, investor funds totaling $685,000 were transferred from bank accounts in the name of 127 Holdings and Advance Entertainment, which accounts are both controlled by Meli, to pay for legal services.  The funds for these payments appear to have come from deposits earlier in January 2017 by investors, including Investors D, E, and F. These payments were not disclosed to investors and were used for purposes inconsistent with representations made to investors by the Defendants.

55.     As a supposed benefit of investing in their ticket resale enterprise, Meli and Harriton offered certain investors complimentary, premium tickets for their personal use to live performances, including the *Hamilton* musical and Adele concerts.  On multiple occasions, after receiving a request from an investor for tickets for personal use to a particular performance and date, Harriton used investor funds from one or more of the Four Entities' bank accounts to purchase several premium tickets on the secondary market, often paying in excess of $1,000 per ticket, well above face value, and sometimes paying significantly more than $1,000 per ticket. Harriton personally placed these ticket orders and arranged for payment of the tickets from investor funds.  The tickets were then provided to the requesting investor at no cost to the investor.  This supposed benefit was offered at least in part for the purpose of duping investors into believing that Meli and Harriton were actually engaged in a large-scale ticket reselling enterprise.  The use of funds from certain investors to purchase tickets for other investors' personal use was not disclosed and was inconsistent with representations made to investors by the Defendants.

### Meli's Recorded Statements to a Cooperating Witness

56.     In or around December 2016, an individual agreed to cooperate with law enforcement authorities, including the Federal Bureau of Investigation, as a cooperating witness

in an undercover criminal investigation.  On multiple instances in December 2016 and January 2017, the cooperating witness (the "CW") consensually recorded conversations with Meli, unbeknownst to Meli.  In one such recorded conversation in December 2016, Meli stated to the CW, among other things: "All I've been doing all along is the shell game.  You know how it works, right?  You take money from one guy to pay off the other guy."  In a separate recorded conversation in December 2016, referring to the source of funds used to repay a particular investor, Meli stated to the CW: "Everything is fungible.  I've been moving things around and playing the shell game to keep that prick at bay by giving him little payments.  But I've been taking it from other people."  Meli also stated to the CW in a December 2016 recorded conversation: "The Advance Entertainment account might as well be my personal account."

Relief Defendants

57.     From January 2015 to January 2017, relief defendant Jessica Ingber Meli or her personal credit card accounts received payments totaling more than $710,000 from 127 Holdings.  Additionally, in or around October 2015, a property was purchased in the name of Jessica Ingber Meli in East Hampton, New York for approximately $3 million in cash funded by investor funds invested in Advance Entertainment.  There is no indication that Jessica Ingber Meli provided services in exchange for these payments to her or her credit card accounts, or for the funds used to purchase the East Hampton property in her name.  These payments were not disclosed to investors and were used for purposes inconsistent with representations made to investors by the Defendants.  Jessica Ingber Meli has no legitimate interest in, or right to, the funds she and her personal credit card accounts received or which were used to purchase a property in her name and which funds represented proceeds of the fraudulent scheme.

58.     From January 2015 to January 2017, relief defendant Anna Meli received payments totaling at least $405,000 from 127 Holdings and Advance Entertainment.  There is no indication that Anna Meli provided services in exchange for these payments to her.  These payments were not disclosed to investors and were used for purposes inconsistent with representations made to investors by the Defendants.  Anna Meli has no legitimate interest in, or right to, the funds she received and which funds represented proceeds of the fraudulent scheme.

59.     From January 2015 to January 2017, relief defendant 127 Partners, an entity controlled by Meli, received payments totaling at least $307,000 from 127 Holdings.  There is no indication that 127 Partners provided services in exchange for these payments.  The payments to it were not disclosed to investors and were used for purposes inconsistent with representations made to investors by the Defendants.  127 Partners has no legitimate interest in, or right to, the funds it received and which funds represented proceeds of the fraudulent scheme.

60.     From January 2015 to January 2017, relief defendant 127 Iconic Holdings, an entity controlled by Meli, received payments totaling at least $489,000 from 127 Holdings.  There is no indication that 127 Iconic Holdings provided services in exchange for these payments.  The payments to it were not disclosed to investors and were used for purposes inconsistent with representations made to investors by the Defendants.  127 Iconic Holdings has no legitimate interest in, or right to, the funds it received and which funds represented proceeds of the fraudulent scheme.

61.     From January 2015 to January 2017, relief defendant Nineteen Two Productions, an entity controlled by Meli, received payments totaling at least $260,000 from Advance Entertainment and 127 Holdings.  There is no indication that Nineteen Two Productions provided services in exchange for these payments.  The payments to it were not disclosed to

investors and were used for purposes inconsistent with representations made to investors by the Defendants.  Nineteen Two Productions has no legitimate interest in, or right to, the funds it received and which funds represented proceeds of the fraudulent scheme.

62.     From January 2015 to January 2017, relief defendant MXCU Holdings, an entity controlled by Harriton, received payments totaling at least $325,000 from Advance Entertainment.  There is no indication that MXCU Holdings provided services in exchange for these payments.  The payments to it were not disclosed to investors and were used for purposes inconsistent with representations made to investors by the Defendants.  MXCU Holdings has no legitimate interest in, or right to, the funds it received and which funds represented proceeds of the fraudulent scheme.

63.     From January 2015 to January 2017, relief defendant Mash Transactions, an entity controlled by Harriton, received payments totaling more than $70,000 from 127 Holdings and 875 Holdings.  There is no indication that Mash Transactions provided services in exchange for these payments.  The payments to it were not disclosed to investors and were used for purposes inconsistent with representations made to investors by the Defendants.  Mash Transactions has no legitimate interest in, or right to, the funds it received and which funds represented proceeds of the fraudulent scheme.

**FIRST CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a)(1), (2) and (3) of the Securities Act)**

64.     Paragraphs 1 through 63 are re-alleged and incorporated by reference.

65.     By reason of the conduct described above, defendants Joseph Meli, Matthew Harriton, 875 Holdings, LLC, 127 Holdings, LLC, Advance Entertainment, LLC, and Advance Entertainment II, LLC, in connection with the offer or sale of securities, by the use of the means

or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the requisite degree of knowledge or state of mind (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

66.   By reason of the conduct described above, Defendants violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c) thereunder)**

67.   Paragraphs 1 through 63 are re-alleged and incorporated by reference.

68.   By reason of the conduct described above, defendants Joseph Meli, Matthew Harriton, 875 Holdings, LLC, 127 Holdings, LLC, Advance Entertainment, LLC, and Advance Entertainment II, LLC, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

69.     By reason of the conduct described above, Defendants violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.     Temporarily, preliminarily, and permanently restrain and enjoin Joseph Meli, Matthew Harriton, 875 Holdings, LLC, 127 Holdings, LLC, Advance Entertainment, LLC, and Advance Entertainment II, LLC, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5];

B.     Enter a temporary restraining order, preliminary injunction, order freezing assets, order requiring an accounting of assets and liabilities, order requiring repatriation of assets, order prohibiting the accepting or depositing of additional investor funds, order allowing expedited discovery, order prohibiting the alteration or destruction of relevant documents, and order for other equitable relief in the form submitted with the Commission's motion for such relief, as to Joseph Meli, Matthew Harriton, 875 Holdings, LLC, 127 Holdings, LLC, Advance Entertainment, LLC, and Advance Entertainment II, LLC;

C.     Order Joseph Meli, Matthew Harriton, 875 Holdings, LLC, 127 Holdings, LLC, Advance Entertainment, LLC, and Advance Entertainment II, LLC,  to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint;

D.      Order Relief Defendant Jessica Ingber Meli to disgorge, with prejudgment interest, all ill-gotten gains obtained by her from any of the Defendants including, but not limited to, payments to her, her personal credit card accounts, and funds used to purchase a property in her name totaling more than $3,710,000, which were transferred from 127 Holdings and Advance Entertainment;

E.      Order Relief Defendant Anna Meli to disgorge, with prejudgment interest, all ill-gotten gains obtained by her from any of the Defendants including, but not limited to, payments to her totaling at least $405,000 from 127 Holdings and Advance Entertainment;

F.      Order Relief Defendant 127 Partners, LLC to disgorge, with prejudgment interest, all ill-gotten gains obtained by it from any of the Defendants including, but not limited to, payments to it totaling at least $307,000 from 127 Holdings;

G.      Order Relief Defendant 127 Iconic Holdings, LLC to disgorge, with prejudgment interest, all ill-gotten gains obtained by it from any of the Defendants including, but not limited to, payments to it totaling at least $489,000 from 127 Holdings;

H.      Order Relief Defendant Nineteen Two Productions, LLC to disgorge, with prejudgment interest, all ill-gotten gains obtained by it from any of the Defendants including, but not limited to, payments to it totaling at least $260,000 from Advance Entertainment and 127 Holdings;

I.      Order Relief Defendant MXCU Holdings, LLC to disgorge, with prejudgment interest, all ill-gotten gains obtained by it from any of the Defendants including, but not limited to, payments to it totaling at least $325,000 from Advance Entertainment;

J.      Order Relief Defendant Mash Transactions, LLC to disgorge, with prejudgment interest, all ill-gotten gains obtained by it from any of the Defendants including, but not limited to, payments to it totaling more than $70,000 from 127 Holdings and 875 Holdings;

K.      Order Joseph Meli, Matthew Harriton, 875 Holdings, LLC, 127 Holdings, LLC, Advance Entertainment, LLC, and Advance Entertainment II, LLC, to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

L.      Appoint a receiver over Defendants and Relief Defendants pursuant to Federal Rule of Civil Procedure 66;

M.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

N.      Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Dated: March 7, 2017                          On behalf of the Commission,
       Boston, MA


                                              //s// Dahlia Rin
                                              Alicia M. Reed (NY Bar # 4913596)
                                              Dahlia Rin* (MA Bar # 674137)
                                              Rebecca Israel** (NY Bar # 4783304)
                                              Martin F. Healey* (MA Bar # 227550)
                                              U.S. Securities and Exchange Commission
                                              Boston Regional Office
                                              33 Arch Street, 24th Floor
                                              Boston, MA  02110
                                              (617) 573-8807 (Rin)
                                              RinD@sec.gov

                                              *Admitted Pro Hac Vice
                                              **Not admitted in the S.D.N.Y.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 7, 2017, I caused a copy of the foregoing document to be filed through the ECF system and, accordingly, the document will be sent electronically to all registered participants as identified on the Notice of Electronic Filing ("NEF").

//s// Dahlia Rin
Dahlia Rin
